07-2794-cv
Schwartz v. Twin City

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2007


(Argued: June 13, 2008          Decided: August 19, 2008)

Docket No. 07-2794-cv, 07-2818-cv

- - - - - - - - - - - - - - - - - - - -x

BERNARD L. SCHWARTZ,

        Plaintiff-Counter-
        Defendant-Appellee,


TWIN CITY FIRE INSURANCE COMPANY,

        Defendant-Cross-Defendant-
        Counter-Claimant-Appellee,

ROYAL INDEMNITY COMPANY,

        Defendant-Cross-Defendant,

    - v.-

LIBERTY MUTUAL INSURANCE COMPANY,

        Defendant-Cross-Claimant-
        Appellant,

NORTH AMERICAN SPECIALTY INSURANCE
COMPANY,

        Defendant-Counter-Claimant-
        Cross-Claimant-Appellant.

- - - - - - - - - - - - - - - - - - - -x

Before:       JACOBS, Chief Judge, POOLER, Circuit Judge, RESTANI,[*] Judge.

Excess insurers appeal from an amended judgment, entered after a jury trial in the United States District Court for the Southern District of New York (Castel, J.), granting damages to their policy-holder and dismissing the bad-faith claims they asserted as subrogees against the primary insurer.  Affirmed.

EDWARD M. SPIRO, Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C., New York, NY (Elkan Ambramowitz, Thomas M. Keane, Sarah J. North, on the brief), for Plaintiff-Counter-Defendant-Appellee Bernard L. Schwartz.

CATHERINE E. STETSON, Hogan & Hartson L.L.P., Washington, DC (William J. Bowman, Paul A. Werner, Hogan & Hartson LLP, Ira G. Greenberg, John F. McCarrick, Edwards Angell Palmer & Dodge LLP, on the brief), for Defendant-Cross-Defendant-Counter-Claimant-Appellee Twin City Fire Insurance Company.

DAVID J. MARGULES, Bouchard Margules & Friedlander, P.A., Wilmington, DE (Sean M. Brennecke, of counsel, Joshua

[*] The Honorable Jane A. Restani, Chief Judge of the United States Court of International Trade, sitting by designation.

Dratel, Law Offices of Joshua Dratel, New York, NY, on the brief), for Defendant-Cross-Claimant-Appellant Liberty Mutual Insurance Company.

PETER A. STROILI, D'Amato & Lynch, New York, NY (Robert E. Kushner, on the brief), for Defendant-Counter-Claimant-Cross-Claimant-Appellant North American Specialty Insurance Company.

DENNIS JACOBS, Chief Judge:

The day before he was to testify as a defendant in a securities class action, Bernard L. Schwartz agreed to a $20 million settlement. He later brought suit in the United States District Court for the Southern District of New York (Castel, J.) against the four companies that covered him for directors and officers liability. He sued the primary insurer, Twin City Fire Insurance Company, for bad faith refusal to settle and breach of contract, and he sued three excess insurers, Royal Indemnity Company, Liberty Mutual Insurance Company, and North American Specialty Insurance Company, for breach of contract. Liberty and North American, pleading equitable subrogation, asserted cross-claims for bad faith against Twin City. Twin City and Royal settled with Schwartz in the course of this litigation.

Liberty and North American appeal from an amended judgment, entered after a jury trial, in favor of Schwartz and Twin City.  See Schwartz v. Twin City Fire Ins. Co., 492 F. Supp. 2d 308 (S.D.N.Y. 2007).  The issues on appeal are whether the jury's verdict in favor of Schwartz was supported by sufficient evidence; whether Schwartz's entitlement to prejudgment interest (under California law) runs from the date he paid the $20 million or from the date the underlying layers of coverage were exhausted; and whether  the cross-claims against Twin City are governed by New York law (which requires a showing of "gross disregard") or by California law (which does not).  For the reasons that follow, we affirm.

**BACKGROUND**

Schwartz was chief executive officer of Globalstar Telecommunications Ltd., a now-defunct public company in the satellite telephone business.  In that capacity, he was covered by $50 million in directors and officers liability insurance.  The primary layer of $10 million was written by Twin City; Royal, Liberty and North American, the first three excess carriers, each provided $5 million in coverage.

4

The remaining layers of coverage were not implicated.

In 2001, after Globalstar revealed that its satellite technology had fizzled, a securities class action was filed against Schwartz, Globalstar, and Loral Space & Communications, Ltd. (a Globalstar investor also under Schwartz's control), alleging violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Globalstar Litigation"). Globalstar timely notified its insurers of the litigation. With Twin City's approval, Schwartz retained Francis Menton to defend him.

After Globalstar and Loral filed for bankruptcy in 2002, the Globalstar Litigation proceeded against Schwartz alone.

Over the following two years, Menton worked with Twin City, Royal, Liberty and North American to negotiate a settlement with the Globalstar Litigation plaintiffs. Counsel to Liberty and North American (the "Excess Insurers") participated in negotiations at which the plaintiffs offered to settle for $15 million, but warned that the demand would rise to $20 or $25 million once trial began. Twin City's counter-offers never rose above $5 million. Settlement was not achieved.

Trial of the Globalstar Litigation began on July 6, 2005. Counsel for the Excess Insurers were in the courtroom monitoring all of the proceedings.

After two weeks of testimony, the only remaining defense witnesses were Schwartz and his damages expert. Facing the prospect of a jury verdict in the hundreds of millions of dollars, Schwartz decided to settle the case. At 10:04 p.m. on Sunday, July 17, 2005, Menton wrote to the four insurers seeking their consent to settle for $20 million.[2] Menton offered to discuss the settlement that night or early the following morning.

On Monday, July 18, 2005, the district court approved the $20 million settlement and discharged the jury. In the course of that day and the following week, all the insurers refused consent.

Twin City refused consent on the stated ground that the plaintiffs' evidence was too weak to merit more than "the $5 million average settlement for shareholder class action lawsuits settled in 2004."

---

[2] At that stage of the litigation, $3 million of Twin City's primary layer had been absorbed by defense fees and costs, leaving $7 million available for settlement. The $20 million figure therefore implicated four layers of coverage: Twin City, Royal, Liberty and North American.

Royal likewise declined to consent.

Liberty acknowledged receiving an email from Menton on Saturday, July 16, relaying plaintiffs' $20 million demand, but said it was unaware of Menton's request for consent to settle until Monday morning. Liberty could not "understand why it would be reasonable to settle at $20 million, particularly in light of the positive developments at trial"; in any event, its obligations had not been triggered because the underlying layers of coverage had not yet been exhausted.

North American's position was that the litigation "should have been settled for an amount at or below $15 million"; that an opportunity to do so had been "squandered" through "no fault of North American's"; that, having "observed the trial closely," North American had seen nothing "that would justify a $5 million increase in the plaintiffs' demand"; that it was "not included in the negotiations of the last 5 days," or "kept apprised of these negotiations in any material way"; and that in any event any demand on it "would appear to be premature," given that the underlying layers of coverage (Twin City, Liberty and Royal) had not paid out their limits.

On August 24, 2005, Schwartz wrote a personal check to the Globalstar plaintiffs for $20 million.

Schwartz then filed this lawsuit, alleging two causes of action: breach of contract against Twin City, Royal, Liberty and North American; and a bad faith claim against Twin City. Liberty and North American, as subrogees, brought bad-faith cross-claims against Twin City. See Commercial Union Assurance Cos. v. Safeway Stores, Inc., 26 Cal. 3d 912, 918 (1980) (explaining that under equitable subrogation, an excess carrier "stands in the shoes of the insured and should be permitted to assert all claims against the primary carrier which the insured himself could have asserted").

Before the coverage suit went to trial, Twin City and Royal settled with Schwartz by paying their policy limits ($10 million and $5 million, respectively).

On the remaining claims, the jury awarded Schwartz $5 million against Liberty and $4,085,723.11 against North American (the full amounts sought); and on the bad-faith cross-claims against Twin City, the jury awarded Liberty $2 million and awarded North American $3 million. The district court entered judgment on January 29, 2007.

8

After post-trial briefing, the district court denied the Excess Insurers' motions for judgment as a matter of law (or, alternatively, a new trial), but amended the judgment in two significant ways. As to the claim against the Excess Insurers, the court awarded Schwartz prejudgment interest measured from the date Schwartz paid the $20 million settlement. As to the bad-faith cross-claims against Twin City, the court decided a choice of law issue that was raised by the jury's finding (in response to a special interrogatory) that Twin City had not acted in "gross disregard" of Schwartz's interests. "Gross disregard" is a requisite finding under New York law, but not under the law of California. The court ruled that New York law applied, and amended the judgment accordingly to dismiss the bad-faith cross-claims.

## DISCUSSION

Liberty and North American challenge the amended judgment on three fronts. First, they seek judgment as a matter of law on the breach of contract claims based on Schwartz's failure to obtain their consent to settle the Globalstar Litigation. Second, they contend that

prejudgment interest (on those claims) should run from the date the underlying layers of insurance were exhausted, as opposed to the date Schwartz paid the $20 million settlement. Third, they argue that California law (rather than New York law) applies to their cross-claims against Twin City.

## I

We review de novo the Excess Insurers' challenge to the denial of their motions for judgment as a matter of law, "viewing the evidence, as the district court was required to, in the light most favorable to the nonmoving party." Sanders v. N.Y. City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004).

Several facts and propositions relevant to Schwartz's claims of breach against the Excess Insurers are not in dispute. First, it is undisputed that California law applies to those claims. Schwartz v. Twin City Fire Ins. Co., 492 F. Supp. 2d 308, 318 (S.D.N.Y. 2007). Second, it is undisputed that the coverage agreements required Schwartz to obtain the Excess Insurers' consent before settling a claim. (The wording of the consent clauses is in the

10

margin.[3])  Lastly, it is undisputed that Schwartz did not obtain the Excess Insurers' consent before settling the Globalstar Litigation.

On appeal, the Excess Insurers advance a simple argument: Schwartz's failure to satisfy the condition precedent of consent to settle absolved of them of their contractual duties.  But the jury found that in refusing

---

[3] This is the Liberty consent clause:

> Defense and Settlement: The insureds shall not admit liability for, offer to settle any claim or incur costs of defense, where the liability, settlement and/or costs of defense are reasonably likely to involve the limit of liability of this Policy, without the Insurer's prior written consent, which consent shall not be unreasonably withheld.

This is the North American consent clause:

> This insurance is subject to the same terms, conditions, agreements, exclusions and definitions as the "Underlying Insurance," except:

> (1) We will have no obligation under this insurance with respect to any claim or suit that is settled without our consent; and

> (2) With respect to any provisions to the contrary contained in this insurance.

consent, the Excess Insurers breached their duties of good faith and fair dealing--duties that are absolute and unconditional under California law.

**A**

"There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.  This principle is applicable to policies of insurance."  Comunale v. Traders & Gen. Ins. Co., 50 Cal. 2d 654, 658 (1958) (citation omitted).  "An insurer owes to its insured an implied-in-law duty of good faith and fair dealing that it will do nothing to deprive the insured of the benefits of the policy."  Fletcher v. W. Nat'l Life Ins. Co., 10 Cal. App. 3d 376, 401 (4th Dist. 1970).

In Gruenberg v. Aetna Ins. Co., 9 Cal. 3d 566 (1973), the California Supreme Court explained that this duty, "the breach of which sounds in both contract and tort," id. at 573, "is unconditional and independent of the performance of [the insured's] contractual obligations."  Id. at 578.  The Gruenberg court concluded that the policy-holder's refusal

to "submit to an examination under oath and to produce certain documents" as required by the insurance policies was no bar to the policy-holder's bad-faith action. Id. at 581. While an insurer and its insured can "define, by the terms of the contract, their respective obligations and duties . . . no matter how those duties are stated, the nonperformance by one party of its contractual duties cannot excuse a breach of the duty of good faith and fair dealing by the other party." Id. at 578. Under California law, an insurer's duty of good faith and fair dealing is "absolute." Id.

In the context of this appeal, "the implied obligation of good faith and fair dealing requires the insurer to settle in an appropriate case although the express terms of the policy do not impose the duty," and further, "in determining whether to settle the insurer must give the interests of the insured at least as much consideration as it gives to its own interests." Crisci v. Sec. Ins. Co., 66 Cal. 2d 425, 429 (1967). In other words, "the insurer must conduct itself as though it alone were liable for the entire amount of the judgment." Johansen v. Cal. State Auto. Ass'n Inter-Ins. Bureau, 15 Cal. 3d 9, 15 (1975). "Such factors

as the limits imposed by the policy, a desire to reduce the amount of future settlements, or a belief that the policy does not provide coverage, should not affect a decision as to whether the settlement offer in question is a reasonable one." Id. at 16. This rule recognizes the potential for conflict between the interests of the insurer and those of its insured:

> [W]hen a settlement within policy limits is offered by claimant, the previously parallel interests of the assured and carrier diverge, and a conflict of interest arises, for while it is invariably to the assured's financial interest to settle within policy limits, settlement is only to the carrier's financial interest when the relationship between settlement offer and policy limits is mathematically favorable in the light of the probabilities of winning or losing the suit.

Merritt v. Reserve Ins. Co., 34 Cal. App. 3d 858, 869-70 (2d Dist. 1973).

"In determining whether an insurer has given consideration to the interests of the insured, the test is whether a prudent insurer without policy limits would have accepted the settlement offer." Crisci, 66 Cal. 2d at 429. A policy-holder seeking recovery for "a judgment in excess of the policy limits" need not show "actual dishonesty, fraud, or concealment" on the part of the insurer. Id. at

14

430.  Rather, "liability may exist when the insurer unwarrantedly refuses an offered settlement where the most reasonable manner of disposing of the claim is by accepting the settlement."  Id.

"Whether the insurer has acted unreasonably, and hence in bad faith, in rejecting a settlement offer is a question of fact to be determined by the jury."  Cain v. State Farm Mut. Auto. Ins. Co., 47 Cal. App. 3d 783, 792 (1st Dist. 1975); see also Allen v. Allstate Ins. Co., 656 F.2d 487, 489 (9th Cir. 1981) ("An insurer's 'good faith' is essentially a matter of fact. . . . Thus, due deference must be granted to the trier-of-fact[,] in this case the jury.").  The question is therefore whether the jury verdict in favor of Schwartz was supported by sufficient evidence.  We conclude that it was.

At trial, the jury heard testimony from the attorneys who represented Schwartz, Twin City, Royal, Liberty, North American and the Globalstar plaintiffs, and the jury reviewed the emails, letters and notes exchanged throughout the Globalstar Litigation.  Together, that evidence showed that Liberty and North American took an active role in the Globalstar Litigation: monitoring the claims, evaluating

settlement possibilities, participating in settlement negotiations, and watching the trial unfold. Specifically, the jury learned about the following series of events.

Liberty and North American participated in three mediation sessions with Schwartz, Royal, Twin City and the Globalstar plaintiffs. All three ended without success after Twin City made settlement offers well below the plaintiffs' $15 million demand. Meanwhile, discovery continued and the Globalstar Litigation progressed to trial.

At the second mediation session, in January 2005, Twin City asked the other insurers to leave the room so that it could settle the case within the primary layer. Twin City then offered $3 million in settlement--one fifth the settlement demand of the Globalstar plaintiffs. The offer was rejected.

The plaintiffs' $15 million offer would have exhausted the layers of Twin City and Royal, while Liberty "would have to pay a small amount," and North American would pay nothing. But after the January 2005 mediation session, Menton warned Liberty and North American that Twin City's "posture in this mediation" was risking exposure of their layers of coverage. Menton testified to telling Liberty and

16

North American: "You need for Twin City to put up all of its layer now; otherwise, the plaintiff will go up and your layers are going to be endangered, and you need to be thinking about and get on top of how you are going to prevent that from happening."

The following month, North American wrote to Twin City, asserting a bad-faith failure to settle: "Given the damages numbers, the uncertain liability defenses and the plaintiffs' words and deeds that confirm they will not settle this case for less than $10 million, any reasonable party would settle this case for an amount at or above the remaining [Twin City] limit of liability."

Liberty wrote to Twin City on March 3, 2005, to the same effect:

> Settlement for an amount up to $12 million is in our estimation reasonable and achievable. Potential damages are, even in a reasonable scenario, far in excess of this amount. We have reviewed the strengths and weaknesses of the Plaintiffs' claims and the Insured's defenses and, notwithstanding [Twin City's] optimism regarding the defensibility of this action, we believe dismissal at summary judgment highly unlikely. . . . [F]urther discovery, including the deposition of Bernard Schwartz, risks revelation of facts adverse to the Insured, thereby driving up the value of the case to the plaintiffs and ensuring that this matter will be tried before a jury.

Liberty reminded Twin City that at the January mediation, the case "appeared capable of settlement" for under $15 million, and warned that a lowball offer from Twin City could "precipitate a move upward by the plaintiffs."

On March 10, Liberty and North American participated in a conference call with Menton and the other insurers' counsel. Menton presented three possible measures: (1) make an offer between $12 and $13 million; (2) move for summary judgment, with the risk of settling for $20 million (or more) if the motion failed; or (3) divide the cost of settlement among several insurers, each contributing $2 to $3 million. The second option was chosen.

Schwartz moved for summary judgment on June 10, 2005. That same day, the parties met for a settlement conference with the district court in New York. Plaintiffs offered to accept $15 million, but said the demand would rise if the summary judgment motion was denied or the case went to trial. Twin City counter-offered $5 million. There was no settlement.

Soon after, Menton wrote as follows to Twin City and Royal, with a copy to Liberty and North American:

> In light of the impending trial, [Twin City] and Royal's unwillingness to resolve this

matter has been prejudicial to both Mr. Schwartz and the other excess insurers, whose layers are increasingly at risk. . . . Unless this matter is settled on June 29, it will proceed to trial immediately after the July 4 weekend. At that point, plaintiffs' willingness to compromise the case for $15 million will have been withdrawn and plaintiffs' current demand of $25 million or some higher number will have replaced it. . . . [A] return by the plaintiffs to their demand of $25 million combined with our approximately $2 million in legal fees above the deductible would mean that [Twin City], Royal, Liberty and North American would each have to contribute their entire policy limits to settlement, and Starr [the next layer excess insurer] would have to contribute a significant portion of its layer.

Menton noted that at trial, the Globalstar plaintiffs would "likely seek to prove $600-$800 million in damages," and warned that it would be "a breach of duty to the insured to subject [Schwartz] to the risk of such mammoth damages when the opportunity to settle within [Twin City] and Royal's limits has been pending for months."

In a separate letter to Liberty and North American, Menton warned "that it may be necessary" for Liberty and one or more of the excess carriers "to participate in the ongoing effort to settle this matter."

For its part, Liberty wrote to Twin City and Royal, accusing them of acting in bad faith. Liberty described the

19

likelihood of success on Schwartz's summary judgment motion as "slim," and noted "that the possibility remains that damages may be awarded in excess of your limits or indeed the Globalstar program in its entirety."

Trial began on July 6, 2005. Counsel to Liberty and North American monitored the Globalstar trial, attending substantially all of the proceedings and participating in ongoing discussions with Menton and the Globalstar plaintiffs about settling the case.

On July 11, Menton alerted all four insurers to "a window of opportunity" to settle the case while the Globalstar plaintiffs felt "vulnerable" about pending motions to exclude plaintiffs' damages expert and for a directed verdict. Menton predicted that, after this "watershed moment," Schwartz would "not have another similarly attractive opportunity to settle this matter." Menton received no response.

The following day, Liberty and North American participated (along with the other parties) in a settlement conference with the court. The trial judge advised that the case would likely reach the jury, and that a plaintiff's verdict could be eight or nine figures. Twin City again

offered $3 million.  The plaintiffs passed.

On Friday, July 15, after two weeks of testimony, two defense witnesses remained: Schwartz and his damages expert. At Royal's behest, Menton asked the Globalstar plaintiffs whether the $15 million settlement figure was still on the table.  Plaintiffs' counsel responded the following day:

> The $15 million number was [what] we would have settled for prior to trial.  In a good faith effort to reach a settlement, even though the trial was already underway, I expressed to you . . . that we still would accept $15 million at that time, before any ruling on the "directed verdict" motion. There was no interest from your side after that discussion.  Since it is clear that the directed verdict motion is not going to be granted in full . . . the $15 million number is off the table.  I reaffirmed this to you and certain representatives of the carriers on Thursday afternoon, stating that we were at $25 million to settle but it was not a firm $25 million. . . . We would accept $20 million to settle at this time; as the case progresses towards a verdict, that number will only increase.

Menton forwarded the message to counsel for Twin City, Royal and Liberty on Saturday, July 16, adding:  "My observation is that you gentlemen, by making ridiculously low bids, waiting until the last possible minute, and bidding against yourselves repeatedly, have completely undermined your insured's position in this matter.  Please

advise by tomorrow about what you want to do."  Menton received no response.

On Sunday, July 17, Menton forwarded the full email exchange to North American and advised:  "It looks like this has now become your problem as well.  If you don't mind my saying it, 'I told you so.'"

The same day, Menton and the Globalstar plaintiffs agreed to settle the case for $20 million.  Menton formally sought consent from Twin City, Royal, Liberty and North American at 10:04 p.m. that night.  Menton offered to discuss the reasonableness of that figure later that night or between 8:45 and 9:00 a.m. on Monday, July 18 at the courthouse.  Over the next days, all four insurers denied consent.

The jury that heard this evidence could find (and evidently did) that Liberty and North American had an adequate opportunity to consider and evaluate the settlement opportunities; that $20 million was a reasonable sum; and that Liberty and North American unreasonably withheld consent.  We therefore decline to disturb the jury verdict.

**B**

Notwithstanding the evidence supporting the jury's verdict, Liberty and North American contend that Schwartz forfeited any right to coverage as a matter of law. We are unpersuaded.

A consent clause entitles an insurer "to notice of a proposed settlement and an opportunity to determine, before the settlement, whether it will grant or withhold consent." Travelers Indem. Co. v. Eitapence, 924 F.2d 48, 50 (2d Cir. 1991). Here, the excess insurance contracts unambiguously (and without exception) required that Schwartz obtain the consent of Liberty and North American before entering into a settlement. Schwartz did not get his insurers' consent to settle, and gave them mere hours (over a Sunday night and Monday morning) to decide whether to consent. So, the argument goes, Schwartz forfeited his right to coverage.

In support of this argument, Liberty and North American cite several cases in which California state courts enforced consent clauses notwithstanding claims of excuse. See, e.g., Gribaldo, Jacobs, Jones & Assocs. v. Agrippina Versicherunges A. G., 3 Cal. 3d 434, 449 (1970) ("[I]t is only when the insured has requested and been denied a

defense by the insurer that the insured may ignore the policy's provisions forbidding the incurring of defense costs without the insurer's prior consent, and under the compulsion of that refusal undertake his own defense at the insurer's expense."); Low v. Golden Eagle Ins. Co., 110 Cal. App. 4th 1532, 1546-47 (1st Dist. 2003) (holding that, in "the rare case where the insured tenders the defense and then negotiates a settlement on its own, leaving the insurer in the dark," the insured's breach "relieved the insurer of posttender costs, too, including the settlement"); Jamestown Builders, Inc. v. Gen. Star Indem. Co., 77 Cal. App. 4th 341, 346 (4th Dist. 1999) ("[I]nsureds cannot unilaterally settle a claim before the establishment of the claim against them and the insurer's refusal to defend in a lawsuit to establish liability. . . . In short, the provision protects against coverage by fait accompli.").

Based on these cases, Liberty and North American argue that, under California law, the failure to obtain consent can be excused only where the insurer breaches a contractual duty to defend, Gribaldo, 3 Cal. 3d at 449, or "where the previous payments were made involuntarily because of circumstances beyond [the insured's] control" (such as

24

inability or exigency), Jamestown, 77 Cal. App. 4th at 348. Here, the Excess Insurers have no duty to defend, and though Schwartz's payment was made under the pressure of an ongoing jury trial, it was not "involuntary" within the narrow meaning of California law. Ergo, Schwartz's breach of the consent clause was unexcused as a matter of contract law.

Liberty and North American also point to Eitapence, in which we affirmed a ruling that an insured lost her coverage by settling a lawsuit without first obtaining her insurer's consent. We wrote:

> The insurer, having insisted on the [consent] clause, is entitled to notice of a proposed settlement and an opportunity to determine, before the settlement, whether it will grant or withhold consent; the fact that in some circumstances its withholding of consent can be successfully challenged as lacking good faith ought not to mean that it should be deprived of the opportunity of assessing the circumstances before the settlement occurs.

924 F.2d at 50.

None of these cases helps the Excess Insurers. In Jamestown, Low and Gribaldo, the insurers had a duty to defend; here, Liberty and North American had no such duty. And in each of the cases cited by the Excess Insurers, the insured either failed to provide notice of the claim or left its insurer in the dark about a proposed settlement. And

25

there was no allegation that the insurers had acted in bad faith. Here, Liberty and North American participated in three mediation sessions and a settlement conference; sent several letters urging Twin City and Royal to settle in light of the risk that the plaintiffs would demand far more than $15 million at trial; and monitored the trial in the courtroom. The record certainly does not require a finding that Liberty and North American were blindsided by Schwartz's request for consent to the $20 million settlement.

C

North American challenges the jury charge on the ground that it allowed the jury to consider the facts and circumstances set out above in deciding whether Schwartz complied with the condition precedent of seeking (and obtaining) his insurers' consent before settlement. Thus, argues North American, the district court failed to instruct the jury on the principle that an insurer must be given "notice of a proposed settlement and an opportunity to determine, before the settlement, whether it will grant or withhold consent." Id. at 50.

We review jury instructions "as [a] whole to determine if they provide a misleading impression or inadequate understanding of the law," Phillips v. Bowen, 278 F.3d 103, 110 (2d Cir. 2002) (internal quotation marks omitted), "and will reverse on this basis only if the []appellants can show that in viewing the charge given as a whole, they were prejudiced by the error." Anderson v. Branen, 17 F.3d 552, 556 (2d Cir. 1994).

We see no error in the jury charge given here. According to North American, the jury's attention should have been focused exclusively on the eleven hours (starting at 10:04 p.m. on Sunday night) that Menton gave the insurers to decide whether to consent to the $20 million settlement, as though that was the interval in which the Excess Insurers had to assess--for the first time--the risks, opportunities and settlement demands at play in the Globalstar Litigation. But the insurers' opportunity to consider settlement extended over a prolonged course of consultation, monitoring and negotiation, so that the settlement was in the nature of anticlimax rather than surprise. The Excess Insurers had participated in mediation sessions at which the parties were expected to respond to settlement offers, accepting or

rejecting them on the spot. And at those sessions, the Excess Insurers learned that the plaintiffs' demands would rise to $20 million or more at trial. The jury was properly allowed to consider this, and much else, in deciding whether the eleven-hour interval of time was sufficient.

**II**

The district court awarded Schwartz prejudgment interest to run from the date Schwartz paid the $20 million settlement. The Excess Insurers argue that Schwartz's right to prejudgment interest vested only when Twin City and Royal exhausted the underlying layers of coverage several months later. The issue is affected by choice of law.

The district court was sitting in diversity, and so it properly applied the choice of law rules of New York, the forum in which it sits. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941). "[U]nder New York choice of law principles, the allowance of prejudgment interest is controlled by the law of [the state] whose law determined liability on the main claim." Entron, Inc. v. Affiliated FM Ins. Co., 749 F.2d 127, 131 (2d Cir. 1984). California law applied to Schwartz's claims against the

28

Excess Insurers; so the district court applied the California statute on prejudgment interest:

> Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt.

Cal. Civ. Code § 3287(a).

California appellate courts review de novo a trial court's award of prejudgment interest under § 3287(a). See State Farm Fire & Cas. Co. v. D & G Autosound, Inc., 2007 WL 4442881, at *7 (2d Dist. Dec. 20, 2007) ("When the facts are not in dispute, a trial court's determination as to whether and when damages were certain or capable of being made certain by calculation is reviewed de novo."); Sukumar v. Wise, 2006 WL 1134771, at *6 (4th Dist. Apr. 28, 2006) ("We therefore may appropriately review on a de novo basis the trial court's application of [§ 3287(a)] to the facts as established by the trial court."); Worthington Constr., Inc. v. L.A. Contractors Corp., 2004 WL 2677088, at *14 (4th Dist. Nov. 24, 2004) ("[W]e disagree with [defendant's] assertion that the abuse of discretion standard applies in

29

cases involving an award of prejudgment interest under [§ 3287(a)].  This is the standard of review to be used in cases dealing with discretionary prejudgment interest for unliquidated claims under [§ 3287(b)], or when there is a breach of an obligation not arising from contract, which by statute is a matter for the jury's discretion." (internal quotation marks and citation omitted)); KGM Harvesting Co. v. Fresh Network, 36 Cal. App. 4th 376, 390-91 (6th Dist. 1995) ("As the facts are not in dispute, we independently review whether and when buyer's damages were certain or capable of being made certain by calculation.  It is from that day that buyer's entitlement to prejudgment interest commences." (footnote omitted)); see also North Oakland Med. Clinic v. Rogers, 65 Cal. App. 4th 824, 828 (1st Dist. 1998) (stating that under § 3287(a) "the court has no discretion, but must award prejudgment interest upon request, from the first day there exists both a breach and a liquidated claim").

**A**

Section 3287(a) applies where the dispute is over liability rather than the amount of damages.  See Canavin v.

30

Pac. Sw. Airlines, 148 Cal. App. 3d 512, 524 (4th Dist. 1983) (explaining that prejudgment interest is mandatory "where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage" (internal quotation marks omitted)).  The so-called "'certainty requirement of [§ 3287(a)] has been reduced to two tests: (1) whether the debtor knows the amount owed or (2) whether the debtor would be able to compute the damages.'"  Polster, Inc. v. Swing, 164 Cal. App. 3d 427, 434-35 (2d Dist. 1985) (quoting Chesapeake Indus., Inc. v. Togova Enter., Inc., 149 Cal. App. 3d 901, 911 (2d Dist. 1983)); see also Wisper Corp. v. Calif. Commerce Bank, 49 Cal. App. 4th 948, 960 (4th Dist. 1996) ("Thus, where the amount of damages cannot be resolved except by verdict or judgment, prejudgment interest is not appropriate." (emphasis added)).

The Excess Insurers concede that Schwartz is entitled to prejudgment interest under § 3287(a).  Our only appellate work on this score is to determine when Schwartz's prejudgment interest clock began to tick.  Schwartz says his damages were "certain" on August 24, 2005, when he wrote a

check for twenty million dollars and no cents. The Excess Insurers say that Schwartz's right to damages did not "vest" until January 5, 2007, when Twin City and Royal settled the coverage litigation and the underlying policy limits were thus exhausted. This factual scenario appears to be one of first impression under California law.

Prejudgment interest under § 3287(a) "runs from the date when the damages are of a nature to be certain or capable of being made certain by calculation and when the exact sum due to the plaintiff is made known to the defendant." Levy-Zentner Co. v. S. Pac. Transp. Co., 74 Cal. App. 3d 762, 798 (1st Dist. 1977); see also Polster, 164 Cal. App. 3d at 434-35 (citing Levy-Zentner test). Put differently, § 3287(a) mandates prejudgment interest "from the first day there exists both a breach and a liquidated claim." North Oakland, 65 Cal. App. 4th at 828; 23 Cal. Jur. 3d Damages § 98 (2008) ("This prejudgment interest on damages runs from the date when the damages are certain or are capable of being calculated to a certainty.")

On the day Schwartz wrote the check, there was a breach: as the jury found, Liberty and North American had unreasonably withheld consent to the settlement. And there

32

was a liquidated claim: Liberty and North American owed Schwartz their share of his covered losses (and litigation costs)--$5 million and $4.085 million, respectively. This would seem to require interest from that date.

The Excess Insurers emphasize, however, that prejudgment interest under § 3287(a) does not begin to run until the "right to recover" damages has "vested," Cal. Civ. Code § 3287(a), and that "[l]iability under an excess policy attaches only after all primary coverage has been exhausted." N. River Ins. Co. v. Am. Home Assurance Co., 210 Cal. App. 3d 108, 112 (2d Dist. 1989).

The Excess Insurers rely on wording from Hartford Accident & Indem. Co. v. Sequoia Ins. Co., 211 Cal. App. 3d 1285 (5th Dist. 1989), a case in which several policies covered the loss, and in which the chief issue under the "other insurance" clauses was which insurance was primary and which was excess. After Hartford paid the full amount to settle the underlying tort litigation in that case, it sued Transamerica and Sequoia. The California appellate court determined that Transamerica and Sequoia were excess to Hartford's primary layer, and (as to Hartford's claim for prejudgment interest) that "the amount of damages

33

recoverable" by Hartford against Transamerica and Sequoia "was 'certain, or capable of being made certain by calculation' and was 'vested' in Hartford on . . . the day Hartford exhausted its primary policy limit"; prejudgment interest began to accrue on that day. Id. (quoting Cal. Civ. Code § 3287(a)) (emphasis added). The Excess Insurers cite this wording for the proposition that an excess insurer in a coverage dispute is not exposed to prejudgment interest until after the underlying coverage is exhausted. But this interpretation overreads Hartford. Hartford was an easier case than ours because the settlement payment simultaneously fixed the damages at sums certain and effected "vesting" by the exhaustion of the primary layer.

In our case, unlike in Hartford, it becomes necessary to allocate the loss caused by the time value of money in the interval between settlement of the underlying claim and exhaustion of underlying coverages--the interval in which the policy-holder successfully litigated his claims for coverage.

The jury's finding that the Excess Insurers breached their duties of good faith and fair dealing simplifies the allocation in this case. The covenant of good faith and

34

fair dealing "is a contract term that aims to effectuate the contractual intentions of the parties." Cates Constr., Inc. v. Talbot Partners, 21 Cal. 4th 28, 43 (1999). Although "compensation for its breach has almost always been limited to contract rather than tort remedies," Foley v. Interactive Data Corp., 47 Cal. 3d 654, 684 (1988), California law recognizes one notable exception: "tort remedies are available for a breach of the covenant in cases involving insurance policies," Cates, 21 Cal. 4th at 43; see also Gruenberg v. Aetna Ins. Co., 9 Cal. 3d 566, 575 (1973) (explaining that "when [an] insurer unreasonably and in bad faith withholds payment of [a] claim of its insured, it is subject to liability in tort"). That includes damages for emotional distress, see id. at 580-81, as well as punitive damages, see Betts v. Allstate Ins. Co., 154 Cal. App. 3d 688 (4th Dist. 1984).

The California Supreme Court has explained that "tort recovery in this particular context is considered appropriate for a variety of policy reasons":

> Unlike most other contracts for goods or services, an insurance policy is characterized by elements of adhesion, public interest and fiduciary responsibility. In general, insurance policies are not purchased for profit or advantage; rather, they are obtained

35

> for peace of mind and security in the event of an accident or other catastrophe. Moreover, an insured faces a unique "economic dilemma" when its insurer breaches the implied covenant of good faith and fair dealing. Unlike other parties in contract who typically may seek recourse in the marketplace in the event of a breach, an insured will not be able to find another insurance company willing to pay for a loss already incurred.

Cates, 21 Cal. 4th at 44 (internal citations omitted).

The same policy considerations justify taxing the insurer with prejudgment interest for the period in which the policy-holder successfully litigates a bad-faith claim against it, notwithstanding an otherwise valid contract defense based on unexhausted underlying limits. It follows that Schwartz is able to recover prejudgment interest as for a tort when his damages became fixed and known--the day he wrote a personal check for $20 million.

We need not consider whether an excess insurer would begin to accrue responsibility for prejudgment interest under California law prior to the exhaustion of underlying coverages if it withholds payment based on that condition precedent and not upon grounds found to have been asserted in bad faith. It is enough in this case to predict that the California Supreme Court would hold that § 3287(a) entitles Schwartz to recover prejudgment interest from the Excess

36

Insurers from the date his losses were certain and ascertainable, notwithstanding that the underlying layers of coverage had not yet been exhausted.

## III

Liberty and North American challenge the district court's choice of New York State law (as opposed to California law) to govern their cross-claims against Twin City. At trial, the district court instructed the jury on the elements of bad faith that are common to California law and New York law, and then instructed the jury to decide (separately) whether the Excess Insurers proved that Twin City acted with "gross disregard" for the interests of the Excess Insurers, a showing that is required for recovery under New York law but not under the law of California. The jury awarded Liberty $2 million and North American $3 million, but found that Twin City did not act with "gross disregard." The district court initially entered judgment in favor of Liberty and North American, but then considered the choice of law issue, decided that the law of New York applied to the Excess Insurers' cross-claims, and filed an amended judgment in favor of Twin City.

37

We review the district court's ruling on a motion to amend the judgment under Rule 59(e) for abuse of discretion. Devlin v. Transp. Commc'n Int'l Union, 175 F.3d 121, 131-32 (2d Cir. 1999). We review the district court's choice of law determination de novo. IBM v. Liberty Mut. Ins. Co., 363 F.3d 137, 143 (2d Cir. 2004).

**A**

The district court had subject matter jurisdiction based on diversity; therefore, "we must determine the body of substantive law that applies here with reference to New York's choice of law rules." Booking v. Gen. Star Mgmt. Co., 254 F.3d 414, 419 (2d Cir. 2001) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 497 (1941)). Under those rules, "[t]he first step . . . is to determine whether there is an actual conflict between the laws of the jurisdictions involved." In re Allstate Ins. Co., 81 N.Y.2d 219, 223 (1993).

New York law recognizes that "[i]nsurers owe a duty to their insureds . . . to act in good faith when deciding whether to settle . . . a claim, and . . . may be held liable for breach of that duty." New England Ins. Co. v.

38

Healthcare Underwriters Mut. Ins. Co., 295 F.3d 232, 241 (2d Cir. 2002) (internal quotation marks omitted).  This duty is also owed to excess insurers, and requires a primary insurer to "giv[e] as much consideration to the excess carrier's interests as it does to its own."  Id. (citing Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir. 2000); Pavia v. State Farm Mut. Auto. Ins. Co., 82 N.Y.2d 445, 453 (1993); St. Paul Fire & Marine Ins. Co. v. U.S. Fid. & Guar. Co., 43 N.Y.2d 977, 978-79 (1987)).

To establish a prima facie case of bad faith, an excess insurer must show that the primary insurer's conduct constituted a "gross disregard" of the excess insurer's interests.  See Pavia, 82 N.Y.2d at 453.  Under this New York standard, the conduct must involve "a deliberate or reckless failure to place on equal footing the interests of [the excess insurer] with its own interests when considering a settlement offer."  Id.  Such showing is satisfied by demonstrating that the primary insurer engaged in behavior evincing a conscious or knowing indifference to the probability that the excess insurer would also be held accountable for a judgment if a settlement offer within the primary insurer's policy limits were not accepted.  See id.

39

Under California law, by contrast, "gross disregard" is not an element of a breach of the covenant of good faith and fair dealing. See, e.g., Love v. Fire Ins. Exch., 221 Cal. App. 3d 1136, 1151 (4th Dist. 1990) ("[T]here are at least two separate requirements to establish breach of the implied covenant: (1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause.").

This "actual conflict" between the laws of New York and California requires a choice. New York applies a "grouping of contacts" theory to contract claims, Auten v. Auten, 308 N.Y. 155, 160-62 (1954), looking to a "spectrum of significant contacts--rather than a single possibly fortuitous event," In re Allstate, 81 N.Y.2d at 226. "The purpose of grouping contacts is to establish which State has 'the most significant relationship to the transaction and the parties.'" Zurich Ins. Co. v. Shearson Lehman Hutton, Inc., 84 N.Y.2d 309, 317 (1994) (quoting Restatement (Second) of Conflict of Laws § 188(1) (1971)). Along with "the traditionally determinative choice of law factor of the place of contracting," the New York Court of Appeals has endorsed the following factors (identified in the

40

Restatement): "the places of negotiation and performance; the location of the subject matter; and the domicile or place of business of the contracting parties." Zurich, 84 N.Y.2d at 317. In the insurance law context, New York recognizes the precept that a court should apply "the local law of the state which the parties understood was to be the principal location of the insured risk . . . unless with respect to the particular issue, some other state has a more significant relationship . . . to the transaction and the parties." Restatement (Second) of Conflict of Laws § 193 (1971); see, e.g., Zurich, 84 N.Y.2d at 318 (considering "what the parties understood to be the location of the risk"). However, "[i]t is commonplace for courts applying New York choice-of-law rules to disregard (or at least discount) the location of the insured risk when the risk is located in two or more states." Maryland Cas. Co. v. Cont'l Cas. Co., 332 F.3d 145, 153 (2d Cir. 2003); see also Restatement (Second) of Conflict of Laws § 193 cmt. b (1971). New York further recognizes that sometimes "the policies underlying conflicting laws in a contract dispute are readily identifiable and reflect strong governmental interests, and therefore should be considered." In re

Allstate, 81 N.Y.2d at 226.  In such cases, a court "may properly consider State interests to determine whether to apply New York law."  Id. at 227.

With these principles in mind, we turn to the Excess Insurers' bad-faith cross-claims against Twin City.

Some factors suggest that "the location of the insured risk" under Globalstar's directors and officers insurance was New York, Maryland Cas., 332 F.3d at 153:  At all relevant times, Schwartz lived and worked in New York, and all but one of Globalstar's corporate officers worked in New York.  Other factors point to California:  The primary policy (of Twin City) was issued into California and contained endorsements intended to conform to California law, and most of Globalstar's 900 employees worked at the company's facility in San Jose, California, making it (arguably) the company's principal place of business.  Since Globalstar's directors and officers insurance "cover[ed] a group of risks that are scattered throughout" both New York and California, the "location of the insured risk" is not determinative here.  Restatement (Second) of Conflict of Laws § 193 cmt. b (1971).

However, "the location of the subject matter" of the

bad-faith cross-claims points strongly toward New York. Zurich, 84 N.Y.2d at 317. The Globalstar Litigation was filed, tried and ultimately settled in New York. Prior to settlement, the parties participated in a mediation session and a settlement conference in New York. (The other two mediation sessions occurred in Washington, DC.) The underlying class action was tried in New York, and Twin City's alleged misconduct was the refusal in New York to settle that New York litigation. None of these events took place in California.

New York policy considerations also militate in favor of applying New York law. That state's "gross disregard" standard reflects a policy of affording insurers latitude "in investigating and resisting unfounded claims." Pavia, 82 N.Y.2d at 454. As a consequence, "there remains a strong presumption in New York against a finding of bad faith liability by an insurer." Hugo Boss Fashions, Inc. v. Fed. Ins. Co., 252 F.3d 608, 624 (2d Cir. 2001). To apply California law to the Excess Insurers' cross-claims, based on an insurer's conduct that took place chiefly in New York, would offend New York's policy choice.

The Excess Insurers plead (in their words) that "it

43

would be unduly confusing to apply the laws of one state to bad faith claims and the laws of another state as to the underlying breach of contract claims." This kind of selectivity, called depecage, "permits a more nuanced handling of certain multistate situations and thus forwards the policy of aptness." Corporacion Venezolana de Fomento v. Vintero Sales Corp., 629 F.2d 786, 794 n.8 (2d Cir. 1980). And it is not altogether uncommon.[4] Moreover, there is no reason to think that the jurors were confused by the application of California law to some claims and New York law to others. After all, the verdict form covered less than two pages.

According to North American's brief, the district

---

[4]See, e.g., Fieger v. Pitney Bowes Credit Corp., 251 F.3d 386, 397 n.1 (2d Cir. 2001) ("There is no conflict in applying New York law to one claim and Connecticut law to another. Under the doctrine of depecage as applied by New York courts, the rules of one legal system are applied to regulate certain issues arising from a given transaction or occurrence, while those of another system regulate other issues." (internal quotation marks omitted)); Babcock v. Jackson, 12 N.Y.2d 473, 484 (1963) ("[T]here is no reason why all issues arising out of a tort claim must be resolved by reference to the law of the same jurisdiction. . . . [I]t is more than likely that it is the law of the place of the tort which will be controlling but the disposition of other issues must turn . . . on the law of the jurisdiction which has the strongest interest in the resolution of the particular issue presented.").

court's choice of New York law "denied the excess carriers the same right that [Schwartz] had under California law to recover in bad faith against Twin City." "Under the doctrine of equitable subrogation," the argument goes, "the duty owed an excess insurer is identical to that owed the insured," Peter v. Travelers Ins. Co., 375 F. Supp. 1347, 1350 (C.D. Cal. 1974), and so the Excess Insurers "stand[] in the shoes" of Schwartz to assert his rights under California law against Twin City, Commercial Union Assurance Cos. v. Safeway Stores, Inc., 26 Cal. 3d 912, 918 (1980).

But Twin City settled with Schwartz before any choice of law issue was litigated or decided. If Schwartz and Twin City litigated under California law, it may be that each thought it applied, or did not choose to contest it, or thought it offered one or another advantage. In any event, it is far from clear that the doctrine of equitable subrogation requires that an excess insurer standing in the shoes of its policy-holder gets the benefit (or detriment) of the litigation choices its policy-holder made or chose to accept.

Finally, North American argues that the district court "improperly" invoked Federal Rule of Civil Procedure 59(e)

"to reverse the jury's award" in its favor.  (The text of the rule is set out in the margin.[5])  We see no merit in this argument.

   "[D]istrict courts may alter or amend judgment 'to correct a clear error of law or prevent manifest injustice.'"  Munafo v. Metro. Transp. Auth., 381 F.3d 99, 105 (2d Cir. 2004) (quoting Collision v. Int'l Chem. Workers Union, Local 217, 34 F.3d 233, 236 (4th Cir. 1994)).  "Rule 59(e) covers a broad range of motions, and the only real limitation on the type of the motion permitted is that it must request a substantive alteration of the judgment, not merely the correction of a clerical error, or relief of a type wholly collateral to the judgment."  11 Charles Alan Wright et al., Federal Practice & Procedure § 2810.1 (2d ed. 2008) (footnote omitted).

   Here, the district court substantively altered the judgment to correct a clear error of law: New York law (as opposed to California law) applies to the Excess Insurers'

---

   [5] "A motion to alter or amend a judgment must be filed no later than 10 days after the entry of the judgment." Fed. R. Civ. P. 59(e).

46

bad-faith cross-claims.  The district court acted well within its discretion.

**CONCLUSION**

For the foregoing reasons, we affirm.

47