10-355(L)
MBIA Inc. V. Federal Ins. Co., et al.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2010

Argued: March 18, 2011          Decided: July 1, 2011

Docket Nos. 10-0355-cv (L); 10-0386-cv (con);
10-0356-cv (XAP)

_____

MBIA INC.,

Plaintiff-Appellee-Cross-Appellant,

– v. –

FEDERAL INSURANCE COMPANY and
ACE AMERICAN INSURANCE COMPANY,

Defendants-Appellants-Cross-Appellees.

_____

Before: SACK, LYNCH, Circuit Judges, and PRESKA, Chief District
Judge.*

_____

        The parties appeal and cross-appeal from a judgment
entered December 30, 2009, in the United States District Court
for the Southern District of New York (Berman, J.), granting in
part and denying in part the motion for summary judgment made by
plaintiff and granting in part and denying in part the motion for
summary judgment made by defendant insurance companies in a
breach of contract action to compel coverage for certain claims
made under directors and officers liability insurance policies.
The district court determined that plaintiff is entitled to
coverage for losses associated with federal and state regulators'
investigations of plaintiff and for losses associated with an
investigation conducted by a special litigation committee after
derivative litigation ensued.  It also determined that plaintiff
is not entitled to coverage for losses associated with the cost
of an independent consultant review of two transactions.  We

_____

* The Honorable Loretta A. Preska, of the United States District
Court for the Southern District of New York, sitting by
designation.

AFFIRM the judgment of the district court in part and REVERSE the judgment in part and REMAND the case for entry of judgment.

_____

ROBERT H. SHULMAN, Kasowitz, Benson, Torres & Friedman LLP,[**] New York, New York, for Plaintiff-Appellee-Cross-Appellant.

CHRISTOPHER T. HANDMAN (David J. Hensler and Jessica L. Ellsworth, on the brief), Hogan Lovells US LLP, Washington, D.C., for Defendant-Appellant-Cross-Appellee Federal Insurance Co.

ALAN J. JOAQUIN (Janet R. McFadden, on the brief), Drinker Biddle & Reath LLP, Washington, D.C., for Defendant-Appellant-Cross-Appellee ACE American Insurance Co.

_____

LORETTA A. PRESKA, Chief District Judge:

This insurance coverage dispute raises three issues arising out of financial regulators' investigations into alleged accounting misstatements by appellee and cross-appellant MBIA, Inc., ("MBIA") and related litigation. Based on these events, MBIA made claims under two $15 million director and officer ("D&O") insurance policies it had purchased from appellants and cross-appellees Federal Insurance Co. ("Federal") and ACE American Insurance Co. ("ACE"). It sought coverage for costs associated with these claims as losses under the policies. Federal and ACE did not believe they were liable for these

_____

[**] The law firm of Howery LLP originally represented MBIA, Inc., in this action and is named on the briefs. It dissolved as of March 15, 2011. Christine S. Davis and Lara A. Degenhart were listed on the brief.

2

claims, and, unsurprisingly, litigation ensued.  Resolving cross-motions for summary judgment, the district court (Berman, J.) granted summary judgment in favor of MBIA on two of its three coverage claims but granted summary judgment in favor of Federal and ACE on one of MBIA's coverage claims.  We affirm in part and reverse in part and remand a portion of the case to the district court for entry of judgment in favor of MBIA.

I. BACKGROUND

MBIA is a Connecticut corporation based in Armonk, New York.  It provides municipalities and other government entities with financial guarantee insurance for their bonds or structured finance obligations; this insurance is a guarantee of payment of principal and interest due.  Like many corporations, MBIA purchased D&O insurance coverage for its directors and officers, as well as MBIA itself for certain claims.  MBIA's policies were purchased from Federal and ACE for the period between February 15, 2004, and August 15, 2005, including a six-month extension.  These policies covered "Securities Claims," which include "a formal or informal administrative or regulatory proceeding or inquiry commenced by the filing of a notice of charges, formal or informal investigative order or similar document."  J.A. at 158.  The policies also cover "Securities Defense Costs," which include costs "incurred in defending or investigating Securities Claims."  Id.  The policies also contemplate that should MBIA seek to invoke coverage, MBIA must give the insurers "the opportunity to

3

effectively associate . . . in the investigation, defense and settlement" of any claim against MBIA and then seek the insurers' consent before settling any covered claim or incurring any costs defending such a claim. Id. at 126. Both policies included $15 million worth of coverage and covered the same claims with the same terms and conditions except as delineated in the ACE policy. The coverage was two-tiered: only after the Federal policy limit was exhausted did the ACE policy provide additional coverage. Because the two policies and claims are parallel in nearly all respects, we will refer to Federal and ACE together as the "insurers" throughout, analyzing the policies together except where we note that the analysis differs with respect to one of the insurers.

The purchases proved prescient. As part of a larger investigation into certain accounting practices in the insurance industry, federal and state regulators targeted MBIA in November 2004. The Securities and Exchange Commission ("SEC") had issued a formal order of investigation on March 9, 2001, ordering an inquiry into certain companies' compliance with the securities laws, their financial recordkeeping, their financial reporting, and related matters. Specifically, the order initiated a private investigation into whether the subject companies "engaged, are engaged, or are about to engage in any of the aforesaid acts, practices, or courses of business, or in any acts, practices, or courses of business of similar purport or object." J.A. at 201.

4

The phrase "acts, practices, or courses of business" refers to the allegations of financial chicanery mentioned above.

Pursuant to that investigation, the SEC issued the first of several subpoenas to MBIA on November 12, 2004. The subpoena did not identify specific transactions, but it compelled MBIA to produce all documents concerning transactions involving "Non-Traditional Product[s]." Id. at 212. These were defined as, in relevant part,

> any product or service developed, marketed, distributed, offered, sold, or authorized for sale . . . that could be or was used to affect the timing or amount of revenue or expense recognized in any particular reporting period, including without limitation, transferring assets off of a Counter-Party's balance sheet, extinguishing liabilities, avoiding charges or credits to the Counter-Party's financial statements, [or] deferring the recognition of a known and quantifiable loss . . . .

Id. (emphasis added). The subpoena also required production of MBIA's accounting treatment of payments in connection with these transactions and any developmental, training, or promotional materials for them, among other things. On November 18, 2004, the New York Attorney General ("NYAG") followed suit and issued its first subpoena, which mirrored the SEC's. Others from both the SEC and the NYAG followed through late 2004. MBIA produced documents to both regulators in tandem.

Ultimately, three of MBIA's transactions came under regulatory scrutiny. The first transaction was MBIA's purchase of reinsurance on its guarantee of bonds issued by a hospital group owned by Allegheny Health, Education and Research

Foundation ("AHERF"). MBIA insured these bonds in 1996, and AHERF declared bankruptcy in 1998 and defaulted. Facing approximately $170 million of exposure on its guarantee, MBIA purchased reinsurance on the AHERF transaction whereby the reinsurers retroactively agreed to assume MBIA's already-realized loss in exchange for a nominal premium. MBIA agreed to give the reinsurers compensation in the form of future premiums from its other financial guarantee business yet continued to assume the risk of default on new loans guaranteed. The aim of this scheme was to allow MBIA to avoid recognizing a large, one-time insurance loss by disguising the loss and spreading payment for it over a longer period of time, increasing its stated earnings. The subpoenas caused MBIA to produce documents concerning the AHERF transaction.

Later, in the summer of 2005, at least two other transactions were subjected to regulatory scrutiny. The first involved MBIA's purchase of an interest in Capital Asset Holdings GP, Inc. ("Capital Asset"), a company that bought delinquent tax liens. After Capital Asset's lender choked off funding for its operations, MBIA provided more capital for the company. Then MBIA, through a subsidiary, guaranteed Capital Asset's securitization of the liens it purchased, thereby transferring the risk of loss on MBIA's investment from MBIA to the subsidiary. These machinations were designed to avoid MBIA's recognizing a loss on the Capital Asset deal immediately, instead

6

spreading the loss out over time because of the way the guarantee was structured.

The second transaction involved MBIA's guarantee of securities used to purchase airplanes for US Airways. When US Airways declared bankruptcy in 2002, rather than wait for a claim on the guarantee, MBIA foreclosed on the airplanes and treated this transaction as an "investment," not an "insurance loss." Here again, MBIA took these steps to avoid recognizing a loss.

In the summer of 2005, the SEC and the NYAG considered issuing additional subpoenas. However, in these instances, MBIA asked the regulators whether they would accept voluntary compliance with their demands for records in lieu of subpoenas to avoid adverse publicity for MBIA. The regulators agreed to those requests, and MBIA complied with their demands for documents concerning the Capital Asset and US Airways transactions.

In May 2005, MBIA initiated the claims process by informing the insurers that it was the target of a regulatory investigation and by providing them with the subpoenas. MBIA asked the insurers for their consent to retain counsel and to incur defense costs. The insurers did not view the subpoenas as sufficient to trigger coverage but accepted the subpoenas as notice of a potential claim under the policies. MBIA proceeded to hire attorneys and defend, respond to, and discuss the regulatory inquiries.

Nevertheless, in August 2005, the regulators advised MBIA that they would take action against it for securities law violations. Apparently, discussions about settling the potential charges were ongoing because on September 27, 2005, MBIA sought consent from the insurers to settle with the regulators. MBIA also met with Federal in person to discuss settlement. By letter dated October 11, 2005, Federal responded to MBIA and said that it understood a settlement for the AHERF transaction requiring payment of approximately $75 million in total to state and federal regulators was under consideration. Federal stated that it did not believe a settlement would be covered, but it allowed MBIA to proceed with settlement, saying that it would not "raise the lack of its written consent to [the] settlements as a defense to coverage." Id. at 1044. Retroactively, ACE took essentially the same approach in December.

MBIA signed an offer of settlement for both the state and federal claims on October 28, 2005, but that offer was preliminary, as the regulators had not completed their investigation into the Capital Asset and US Airways transactions at that time. To allow settlement talks to proceed despite this loose end, MBIA and the regulators agreed that an independent consultant, paid by MBIA, could complete a review of those transactions and report on a proposed remedy if misconduct was uncovered. MBIA first informed the insurers of this development in September 2006. Meanwhile, the independent consultant had

8

begun work. MBIA offered an assurance of discontinuance to the NYAG in November 2005 that would result in MBIA's payment of a $15 million civil penalty and $10 million in disgorgement upon acceptance by the New York Superintendent of Insurance. By December 2006, the SEC and MBIA reached an agreement in principle under which MBIA would pay a $50 million civil penalty for the AHERF transaction. Both offers of settlement to regulators contained a provision for an independent consultant review of the two outstanding investigations. The settlements were executed and accepted by both regulators in late January 2007. Ultimately, the independent consultant exonerated MBIA of any wrongdoing for the Capital Asset and US Airways transactions. The investigations were closed in 2007.

After these investigations came to light, lawsuits against MBIA alleging financial wrongdoing were filed. Two actions are relevant here, one filed in the United States District Court for the Southern District of New York and one filed in the New York Supreme Court. On the way to filing suit, two shareholders sent separate demand letters to MBIA asking the board to file suit against directors and officers for the alleged wrongdoing being investigated by regulators at the time. In due course, MBIA set up a committee of independent directors (the "Demand Investigation Committee" or "DIC") to investigate these demands.[1] MBIA did not act on the shareholder demands, which is

---

[1] The policies contain a separate $200,000 sublimit for costs

(continued...)

effectively a rejection of the demand under governing Connecticut law, but the shareholders persisted and filed two derivative lawsuits.  When the lawsuits were filed, MBIA reconstituted the DIC as the "Special Litigation Committee" ("SLC") to determine whether maintaining these suits was in the best interests of MBIA.  The SLC determined, after an investigation by outside counsel hired by the SLC, that it was not and filed a motion to dismiss the complaints.  The lawsuits were terminated.

Following all of this turmoil, Federal agreed to pay approximately $6.4 million to cover losses from the SEC's AHERF transaction investigation and related lawsuits, including $200,000 for the DIC's investigation.  But it refused to cover losses related to the Capital Asset and US Airways transactions and to the NYAG's AHERF transaction investigation.  Because the Federal policy limit was not breeched, ACE paid nothing.  MBIA disagreed with the insurers' interpretation of what the policies covered.  It filed suit to compel the insurers to cover costs related to (1) both regulators' investigations of all three transactions, (2) the independent consultant's investigation pursuant to the settlement, and (3) the work of the SLC.  The district court granted summary judgment in favor of MBIA with respect to costs related to the investigation of the transactions and the costs incurred by the SLC.  <u>MBIA, Inc. v. Fed. Ins. Co.</u>,

---

[1](...continued)
related to the investigation of shareholder demands.  J.A. at 167.  No one argues that Federal should not have applied this limit to its coverage for costs incurred by the DIC.

No. 08 Civ. 4313, 2009 WL 6635307, at *7-9 (S.D.N.Y. Dec. 30, 2009).  It granted summary judgment in favor of the insurers, however, with respect to costs related to the independent consultant's investigation.  Id. at *8-9.  These appeals followed.


II. ANALYSIS

The applicable law is straightforward.  We review de novo the district court's grant of summary judgment.  Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir. 2011).  In so doing, we construe the facts in the light most favorable to the nonmoving party and, drawing all reasonable inferences in its favor, affirm when "'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  Id. (quoting Fed. R. Civ. P. 56(a)).

In this diversity case, the issues are governed by either New York or Connecticut state law.  See Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010).  We need not make a choice-of-law determination because under both states' regimes, the applicable legal principles are aligned.  An insurance contract is interpreted under ordinary common-law contract principles, and we "give effect to the intent of the parties as expressed in the clear language of the contract."  Morgan Stanley Grp., Inc. v. New Eng. Ins. Co., 225 F.3d 270, 275 (2d Cir. 2000) (internal quotation marks omitted) (applying New York law);

11

accord Griswold v. Union Labor Life Ins. Co., 442 A.2d 920, 923 (Conn. 1982).  We agree with the district court and the parties that the contract is unambiguous, so the plain meaning of its terms control.  Cont'l Ins. Co. v. Atl. Cas. Ins. Co., 603 F.3d 169, 180 (2d Cir. 2010).  In the end, the insured bears the burden of showing that an insurance coverage covers the loss, but the insurer bears the burden of showing that an exclusion applies to exempt it from covering a claim.  Morgan Stanley Grp., 225 F.3d at 276 & n.1.  Doubts are resolved in favor of the insured. See id. at 276.

On appeal, the insurers argue that the district court erred in two ways.  First, they argue that it erred because both the SEC's and the NYAG's investigations into the Capital Asset and US Airways transactions are not covered "Securities Claim[s]" under the policies and because the NYAG's investigation of the AHERF transaction is likewise not covered.  Second, they argue that it erred because costs incurred by the SLC were either not covered or subject to the $200,000 policy sublimit.  In its cross-appeal, MBIA argues that the district court erred in its analysis denying it coverage for the costs of the independent auditor.  We address these arguments sequentially.

A. Investigation Costs Coverage

The insurers' first argument involves the scope of coverage provided in Insuring Clause 3, which states: "The Company [i.e., the insurers] shall pay on behalf of any

Organization [i.e., MBIA and subsidiaries] all Securities Loss for which it becomes legally obligated to pay on account of any Securities Claim first made against it during the Policy Period . . . ."  A "Securities Claim" is defined as, in relevant part, "a formal or informal administrative or regulatory proceeding or inquiry commenced by the filing of a notice of charges, formal or informal investigative order or similar document."  J.A. at 158. The question here is whether the expenses claimed in connection with the regulators' investigations fall within this definition.[2] To answer this question, we analyze the various items MBIA argues are "Securities Claims": the NYAG's investigation of the AHERF transaction and the SEC's and the NYAG's investigation of the Capital Asset and US Airways transactions.  We proceed in that order.

### 1. The NYAG Investigation of AHERF

We agree with the district court that the NYAG's subpoena on the AHERF transaction was a "Securities Claim." Under New York law, the NYAG may commence an investigation when, in his discretion, "he believes it to be in the public interest that an investigation be made."  N.Y. Gen. Bus. Law § 352(1). The outward-facing form that investigation takes is the service of a subpoena, which, on its face, commands the production of documents and threatens criminal penalties for noncompliance. See, e.g., People v. Thain, 874 N.Y.S.2d 896, 899 (N.Y. Sup. Ct.

---

[2] The parties do not dispute that the costs claimed would be "Securities Loss[es]" as defined in the policies.

2009) (stating that the NYAG may require information pursuant to the investigation and "[t]o that end, he is empowered to subpoena witnesses" and documents (internal quotation marks omitted)); Sanborn v. Goldstein, 118 N.Y.S.2d 63, 64 (N.Y. Sup. Ct. 1952) (stating that the NYAG "commenced an investigation pursuant to [the Martin Act] . . . by service of a subpoena upon plaintiff"); see also N.Y. Gen. Bus. Law § 352(4). Backed by the enforcement authority of the state, the NYAG subpoena is at least a "similar document" to a "formal or informal investigative order" that commenced a regulatory proceeding, as stated in the policies.

Moreover, we agree with the district court's sensible intuition that a businessperson "would view a subpoena as a 'formal or informal investigative order' based on the common understanding of these words." MBIA, Inc., 2009 WL 6635307, at *6 (internal quotation marks omitted). In any event, the subpoena is, at absolute minimum, a "similar document" to those listed the definition of a "Securities Claim" because it is similar to other forms of investigative demands made by regulators. See, e.g., ACE Am. Ins. Co. v. Ascend One Corp., 570 F. Supp. 2d 789, 796 (D. Md. 2008) (subpoenas may constitute insurance claims when issued by a governmental investigative agency).

We reject the insurers' crabbed view of the nature of a subpoena as a "mere discovery device" that is not even "similar" to an investigative order. The New York case law makes it

14

crystalline that a subpoena is the primary investigative implement in the NYAG's toolshed. We also reject the insurers' argument that because the definition does not include a proceeding commenced by the service of a subpoena, a subpoena is not included. This reading puts form over substance; the fact that the definition does not say "service of a subpoena" is not dispositive.

Because the plain-language understanding of a "Securities Claim" includes this subpoena, "Securities Loss" arising from this investigation is covered.

### 2. Capital Asset and US Airways Transactions

We now turn to whether "Securities Loss" in connection with the Capital Asset and US Airways transactions is covered. This determination turns on two factors: whether the SEC's investigation of these transactions was within the scope of its formal order and whether the NYAG's similar investigation was within the scope of its AHERF investigation, which is a covered "Securities Claim." We begin with the SEC investigation.

### a. The SEC Investigation

The text of the SEC's formal order stated that the SEC was empowered to investigate whether AIG and other insurance companies, including MBIA, engaged in securities fraud, accounting misstatements, reporting misstatements, or other "acts, practices, or courses of business of similar purport or object." J.A. at 201. The district court held that the

15

investigation into these two transactions was an investigation of a "course[] of business of similar purport or object" and, thus, within the scope of the formal order. We agree.

As we described, the three transactions at issue here all involved MBIA's attempts not to report or to delay reporting a loss. The subpoena that accompanied the formal order stated that the SEC sought documents involving transactions designed to "affect the timing or amount of revenue or expense recognized," including "extinguishing liabilities," and "deferring the recognition of a known and quantifiable loss." Id. at 212. Although the mechanics MBIA employed in each of the three transactions differed somewhat (as we described above), there can be no doubt that all of them involved efforts to delay, reduce, or eliminate the reporting of a loss, precisely as described in the subpoena. Indeed, the AHERF transaction involved an attempt not to book a loss at all, the Capital Asset transaction involved an attempt to spread the recognition of a loss out over time, and the US Airways transaction involved an effort to avoid booking a loss (and, in fact, to represent that MBIA was making an investment in the airplanes it repossessed). These courses of business fall within the scope of the transactions for which documents were subpoenaed by the SEC as "Non-Traditional Product[s]." This circumstance is highly probative of the scope of the investigation authorized by the SEC's formal order.

16

The formal order authorized the SEC to investigate "any" of the broadly described acts and courses of business listed in the formal order. Combined with the specific definition of the items subpoenaed by the SEC, we conclude that the plain meaning of the formal order includes these transactions within its scope because they involved a course of business "of similar purport or object" to that described in the formal order. Cf. RNR Enters., Inc. v. SEC, 122 F.3d 93, 98 (2d Cir. 1997) (concluding that a formal order predating company under investigation included the company because of similarly inclusive wording).

The insurers essay several reasons why they think the formal order does not include the Capital Asset and US Airways transactions. First, they point to the caption of the SEC's formal order, "In re Loss Mitigation Insurance Products," to argue that this phrase delimits the scope of the SEC's investigation to a certain sub-class of financial transactions. This argument is unpersuasive. We do not doubt that "[t]he purposes of such an order seem to be to define the scope of the ensuing investigation and to establish limits within which the staff may resort to compulsory process." SEC v. Jerry T. O'Brien, Inc., 467 U.S. 735, 738 n.1 (1984). But the caption alone does not serve these functions; the whole order does. The only place this phrase occurs is in the caption to the formal order, and the operative language contains no limitation in scope

17

to a certain "product," nor does it appear to contemplate such a limitation. Instead, it announces a broad but definite investigatory scope that includes these transactions as we described. In this way, it is quite telling that the actual subpoenas issued cover allegations involved in the Capital Asset and US Airways transactions. And SEC subpoenas are enforceable only when they request "reasonably relevant" information in connection with the investigation. RNR Enters., 122 F.3d at 97 (quoting United States v. Morton Salt Co., 338 U.S. 632, 652 (1950)); see H.R. Rep. No. 96-1321, pt. 1, pt. 2 (1980), reprinted in 1980 U.S.C.A.A.N. 3874, 3889. In short, the caption to the formal order does not operate in the way advanced by the insurers here to narrow the scope of the SEC's investigatory authority as set out in the text of the order. Cf. RNR Enters., 122 F.3d at 97 (deferring to SEC's determination of relevance in challenge to subpoena by measuring value of information against "general purposes of the agency's investigation").

The insurers next argue that these investigations were conducted by way of oral request rather than subpoena or other formal process. This argument is meritless. The investigation, oral or by way of subpoena, was connected to the formal order. The sole reason the SEC did not issue subpoenas is that MBIA requested this procedure, and the SEC believed that MBIA would fully comply on a voluntary basis. The insurers cannot require that as an investigation proceeds, a company must suffer extra

18

public relations damage to avail itself of coverage a reasonable person would think was triggered by the initial investigation.

The insurers also argue that the SEC began investigating these transactions because it was "tipped off" by a disenchanted investor in Capital Asset and by New York insurance regulators questioning the US Airways transaction. Whatever the accuracy of this assertion, we fail to see how the SEC's investigative source is relevant to the coverage determination.

Finally, the insurers argue that because the SEC official who made the oral requests was not named on the formal order, the requests were not pursuant to that order. This argument, too, fails. The individuals named on the formal order are empowered to compel testimony, Jerry T. O'Brien, 467 U.S. at 737-38, but the investigation authorized by the formal order need not be pursued only by those individuals. In addition, this policy provides coverage for "informal investigative orders," and the oral inquiries fit that description.[3]

As with the AHERF transaction, the SEC's investigation of the Capital Asset and US Airways transactions was commenced by the SEC's formal order. MBIA's "Securities Loss" related to

---

[3] Similar policies that have engendered litigation do not include coverage for "informal" investigations. E.g., Capella Univ., Inc. v. Exec. Risk Specialty Ins. Co., 617 F.3d 1040, 1043 (8th Cir. 2010) (coverage for "formal investigation"); Med. Mut. Ins. Co. of Me. v. Indian Harbor Ins. Co., 583 F.3d 57, 61 n.3 (1st Cir. 2009) (same); Cmty. Found. for Jewish Educ. v. Fed. Ins. Co., 16 F. App'x 462, 465 (7th Cir. 2001) (unpublished) (same).

responding to it is therefore covered because the investigation was pursuant to a "formal or informal investigative order."

### b. The NYAG Investigation

Our analysis of MBIA's claim for coverage for "Securities Loss" related to the NYAG's investigation of the Capital Asset and US Airways transactions proceeds similarly. By the time the NYAG's office began looking into these transactions, its AHERF investigation was already underway. The NYAG's subpoena contained the same definition of "Non-Traditional Product[s]" as the SEC's subpoena, so documents relating to these transactions were included in its scope. As with the SEC's investigation, MBIA requested that the NYAG issue no further subpoenas after the AHERF subpoena, promising that MBIA would comply fully with all demands. The NYAG agreed, like the SEC, to this procedure and continued its investigation with oral requests. Therefore, for the same reasons that "Securities Loss" related to the SEC's investigation into the Capital Asset and US Airways transactions is covered, such loss related to the NYAG's investigation into these transactions also is covered.

### 3. Summary

For the reasons stated above, MBIA's "Securities Loss" related to (1) the NYAG's investigation into the AHERF transaction and (2) both the SEC's and the NYAG's investigations into the Capital Asset and US Airways transactions is covered under the policy. Each of the investigations was commenced by a

20

"formal or informal investigative order or similar document" and is therefore a "Securities Claim."

B. Derivative Litigation Coverage

Turning to the insurers' second contention, the costs incurred by the SLC in terminating the derivative litigation were covered "Defense Costs" (or "Securities Defense Costs") under the policies. The policies provide coverage (under Insuring Clauses 2 and/or 3) to MBIA and/or its directors for expenses incurred in defending or investigating claims (including "Securities Claims"). J.A. at 131, 158. A claim includes a lawsuit. Id.

The insurers argue that the SLC-related costs are not covered for three main reasons. First, they say that the costs were incurred by the SLC (and not MBIA or any individual directors) and that the SLC is not an "Insured Person."[4] Second, they focus on the nature of a derivative suit to say that granting MBIA coverage for the SLC's role would render the $200,000 sublimit for demand investigation costs superfluous. See supra note 1. Third, they rely on exclusions from the definition of "Loss." We conclude that the costs are covered.

We begin with the anatomy of a derivative action. Connecticut law applies here because the suits alleged state claims against MBIA, a Connecticut corporation. Halebian v.

_____

[4] An "Insured Person" is defined as "any past, present or future duly elected director or duly elected or appointed officer of [MBIA]." J.A. at 131. The definition also includes MBIA itself in providing coverage for "Securities Loss." Id. at 157-58.

<u>Berv</u>, 590 F.3d 195, 206 (2d Cir. 2009); <u>May v. Coffey</u>, 967 A.2d 495, 501 n.6 (Conn. 2009). In Connecticut, shareholders must perform two distinct steps to initiate a derivative suit. <u>See</u> <u>Stutz v. Shepard</u>, 901 A.2d 33, 36 n.5 (Conn. 2006). First, a disenchanted shareholder must make a demand on the corporation "to take suitable action."[5] Conn. Gen. Stat. Ann. § 33-722. Then, after one of three events, the shareholder may commence a derivative suit: (1) the passing of ninety days without any action by the corporation, (2) notification that the shareholder's demand is rejected, or (3) a showing that irreparable injury would follow if the court waited for the ninety-day period to expire. <u>Id.</u>

Connecticut law also provides that a corporation may form a committee of independent directors to determine whether maintaining a derivative action is in the best interests of the corporation. <u>Id.</u> §§ 33-605, 33-724; <u>Frank v. LoVetere</u>, 363 F. Supp. 2d 327, 333 (D. Conn. 2005). If that committee determines "in good faith, after conducting a reasonable inquiry upon which its conclusions are based," that maintaining the suit is not in the best interests of the corporation, it has the authority to move for dismissal. Conn. Gen. Stat. Ann. § 33-724(a). On such a motion, the court "shall" dismiss the lawsuit. <u>Id.</u>

---

[5] Because this case involves a situation where demands were made on the board, we do not address demand futility. <u>See</u> <u>Joy v. North</u>, 692 F.2d 880, 887-88 (2d Cir. 1982); <u>Sheehy v. Barry</u>, 89 A. 259, 261 (Conn. 1914).

22

Here, both shareholders followed the two-step process and made a demand before filing suit. Ultimately, after the DIC performed its work, MBIA did not act within the ninety-day period provided by Connecticut law. Thereafter, the shareholders took the next step and filed lawsuits. MBIA formed the SLC to determine MBIA's response to this litigation, and the SLC decided to terminate the litigation. The SLC entered appearances for MBIA and filed motions to dismiss on its behalf in both the state and federal cases. The federal suit was voluntarily dismissed pursuant to Rule 41 of the Rules of Civil Procedure before the court could rule on it; the parties do not dispute that the state court action was also terminated, although the record does not indicate in precisely what manner.

Connecticut law allows this procedure. The board may terminate derivative litigation by a majority vote of either of two sub-units of the board: (1) the independent directors if they constitute a quorum or (2) a committee composed of at least two independent directors. Id. §§ 33-605, 33-724(b). "A corporation, possessing an identity only in a legal sense," can act only through its agents. In re Payroll Express Corp., 186 F.3d 196, 207 (2d Cir. 1999). That Connecticut law permits the board to terminate a derivative suit is an extension of the fundamental principle that the management and ownership of a corporation are divided, with management undertaken by the board. Conn. Gen. Stat. Ann. § 33-735(b). In other words, corporate

23

powers and management are exercised by agents "under the authority of" or "under the direction of" the board. <u>Id.</u> The SLC was one way MBIA exercised its powers. <u>See, e.g.</u>, <u>id.</u> § 33-724(a); <u>Zapata Corp. v. Maldonado</u>, 430 A.2d 779, 785 (Del. 1981) ("[A]n independent committee possesses the corporate power to seek the termination of a derivative suit."); Revised Model Bus. Corp. Act § 7.44 official cmt. (citing <u>Aronson v. Lewis</u>, 473 A.2d 805, 813 (Del. 1984), <u>overruled on other grounds by</u> <u>Brehm v. Eisner</u>, 746 A.2d 244 (Del. 2000)).[6]

Dismissal of the suits was MBIA's decision, undertaken pursuant to the powers granted to MBIA under Connecticut law, Conn. Gen. Stat. Ann. § 33-724(a), and exercised by the SLC as permitted under Connecticut law, <u>id.</u> § 33-724(b)(2). <u>See also</u> <u>Aronson</u>, 473 A.2d at 813 (stating that, ultimately, the board "retains its . . . managerial authority to make decisions regarding corporate litigation"). We thus reject the insurers' suggestion that the SLC was not an "Insured Person."

---

[6] Because Connecticut law on certain derivative litigation issues is not particularly well developed, <u>Frank</u>, 363 F. Supp. 2d at 334, we look to the Revised Model Business Corporations Act ("RMBCA"), on which the Connecticut statute is based, and Delaware law to elucidate fundamental principles, not substantive rules, because those principles bear on these issues. We are aware that Delaware law does not control and do not in any way suggest that it supplies the rule of decision. <u>May</u>, 967 A.2d at 501 n.6. Nevertheless, Delaware jurisprudence is useful in discussing general principles. RMBCA § 7.44 official cmt., pt. 2 (stating that the relevant section of the statute "is similar in several respects . . . to the law as it has developed in Delaware" but noting certain procedural differences).

24

To counter this reasoning, the insurers argue that the SLC was required to operate independently of MBIA. They postulate that this circumstance means that the SLC took on an identity and exercised powers separate and apart from those granted to MBIA. This is argument by sleight of hand. Connecticut law — and corporation law generally — requires that the decision to proceed with or terminate derivative litigation be made by independent directors to satisfy their fiduciary duties. Conn. Gen. Stat. Ann. § 33-724(a)-(b); see, e.g., Aronson, 473 A.2d at 811-12, 814. "Independent" in this context means independence of judgment — a lack of conflicts of interest. See Conn. Gen. Stat. Ann. § 33-605; Frank, 363 F. Supp. 2d at 333; see also RMBCA § 1.43 official cmt. (stating that such directors must be "disinterested" and "independent" so as to avoid a "likelihood that that director's objectivity will be impaired"). Independence of judgment does not generate a new source of authority to terminate derivative litigation; that authority is still exercised by the corporation, which can act only through its agents. Aronson, 473 A.2d at 813; see Conn. Gen. Stat. Ann. § 33-724(a)-(b); Frank, 363 F. Supp. 2d at 333, 335 ("[A] corporation should be free to determine in its own business judgment whether litigation is in its best interest . . . ."). We do not agree with the insurers' characterization of the SLC's "independence."

The insurers' second argument relies on the nature of a derivative suit. Relying on the precept that an interpretation rendering a contract term superfluous is "disfavor[ed]," Int'l Multifoods Corp. v. Comm'l Union Ins. Co., 309 F.3d 76, 86 (2d Cir. 2002), the insurers say that because the SLC investigates whether to maintain a derivative suit, coverage of the SLC's costs would eviscerate the sublimit applicable to the investigation of shareholder demands. We disagree.

The $200,000 sublimit provides that the insurers' "maximum liability for all Investigation Costs covered under Insuring Clause 4 on account of all Shareholder Derivative Demands . . . shall be $200,000." J.A. at 167. Insuring Clause 4 states:

> The [insurer] shall pay on behalf of [MBIA] all Investigation Costs which [MBIA] becomes legally obligated to pay on account of any Shareholder Derivative Demand first made during the Policy Period . . . for a Wrongful Act committed, attempted, or allegedly committed or attempted, by an Insured Person before or during the Policy Period.

Id.

In this instance, the insurers' argument requires that the $200,000 sublimit operate as an exclusion of coverage. They therefore "bear[] the burden of proving that the claim falls within the scope of an exclusion." Vill. of Sylvan Beach v. Travelers Indem. Co., 55 F.3d 114, 115 (2d Cir. 1995) (citing Maurice Goldman & Sons, Inc. v. Hanover Ins. Co., 607 N.E.2d 792, 793 (N.Y. 1992)). To do so, the insurers must show that the

policies, in "clear and unmistakable language," exclude coverage. Id. (internal quotation marks omitted). Bearing in mind that we must read a contract "as a whole" and construe terms in context, Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 467-68 (2d Cir. 2010), we conclude that the insurers do not meet this burden.

The policies' structure and terms track the statutory shareholder grievance process. Insuring Clause 4, with its concomitant $200,000 sublimit, by its terms applies to costs related to investigating "Shareholder Derivative Demands," which involves the first step in Connecticut's regime. But when a demand is rejected and the shareholders file a derivative suit in court, the application of Insuring Clause 4 to further investigative costs is less obvious. At best, to cover such costs, the language "on account of any Shareholder Derivative Demand" would have to be expanded to include the second stage of the Connecticut process, a lawsuit. At that stage, however, Insuring Clause 2 or 3 squarely applies because both provide coverage for costs "incurred in . . . investigating" "Claims" or "Securities Claims," respectively, each of which is defined expressly to include lawsuits. J.A. at 131, 158. Thus, either or both of Insuring Clauses 2 and/or 3 certainly provide coverage at the lawsuit stage. This view of the policies makes sense because their structure and terms mirror the two-stage shareholder grievance process of the Connecticut statute:

Insuring Clause 4 specifically references a shareholder derivative demand, while Insuring Clauses 2 and 3 specifically reference lawsuits.[7]  Irrespective of whether the language of Insuring Clause 4 bridges the gap between the demand stage and the litigation stage of a shareholder grievance — a question on which we take no view — we find certainty in saying only that the insurers have not met their heavy burden to show that the exclusion, as it operates here, applies.

Finally, the insurers attempt to rely on the policies' exclusion of "any amount incurred by [MBIA] (including its board of directors or any committee of the board of directors) in connection with the investigation or evaluation of any Claim or potential Claim by or on behalf of [MBIA]" from the definition of "Loss."  J.A. at 144.  Here, the insurers bear the burden to "establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case."  Cont'l Cas. Co. v. Rapid-Am. Corp., 609 N.E.2d 506, 512 (N.Y. 1993).  The insurers do not carry this heavy burden in this case.

---

[7] The formation of an SLC is far from an aberration.  E.g., Strougo v. Bassini, 282 F.3d 162, 167 n.3 (2d Cir. 2002) (SLC formed to investigate shareholder derivative suit); Stutz, 901 A.2d at 37 (same); In re Comverse Tech., Inc., 866 N.Y.S.2d 10, 17 (N.Y. App. Div. 2008) (same); see also, e.g., In re Am. Int'l Grp. Inc. Consol. Derivative Litig., 976 A.2d 872, 881 n.13 (Del. Ch. 2009) (same).  The insurers know how corporations evaluate derivative litigation and could have written the contract to contemplate exactly this situation.  Indeed, the specific attention given in the policies to the demand investigation portion of this process suggests that the parties knew how to contract about costs related to the SLC.

28

To avail themselves of this exclusion, the insurers primarily rely on the procedural fact that MBIA is a plaintiff in the caption of the cases because the lawsuits, which are "Claims," were filed "on behalf of" MBIA. But MBIA is named as a nominal defendant in the caption of these derivative actions as well. This situation is unsurprising because, in a derivative suit, the "corporation is in an anomalous position of being both a defendant and a plaintiff in the same action."[8] Ma'Ayergi & Assocs., LLC v. Pro Search, Inc., 974 A.2d 724, 728 (Conn. App. Ct. 2009). Thus, the insurers' reliance on the "on behalf of" language provides only equivocal support for their position. Moreover, we think that the exclusion in the definition of "Loss" is not clearly applicable to the costs incurred by the SLC because those costs were, at least to some extent, related to litigation, not investigation. In sum, we are not persuaded that MBIA has carried its burden to show that this exclusion applies.

The costs incurred by the SLC are covered under the policies.

C. Independent Consultant Coverage

The final issue remaining is whether the costs of the independent consultant are covered. MBIA informed the insurers in September 2005 of settlement discussions requiring payment of

---

[8] This awkward procedural posture is an accident of history. The derivative suit evolved from equity, where two suits were brought, one against the corporation to compel action and the other against the individual officers and directors for alleged malfeasance. This procedure evolved into a single action. See generally Ross v. Bernhard, 396 U.S. 531, 537-39 (1970).

approximately $75 million in disgorgement and penalties.  Because the regulators had not completed their investigation into the Capital Asset and US Airways transactions, in October 2005, they asked MBIA to add an independent consultant ("IC") review of those transactions as a condition of any settlement.  MBIA would pay for this review, which increased the costs of the total settlement.  While MBIA made settlement overtures during this time, settlement itself remained tentative.

The IC began work in mid-2006, and the insurers were first notified of the addition of the IC in September 2006.  In October 2006, the insurers and MBIA again discussed settlement proposals under consideration, including the regulators' insistence on an IC review.  On December 6, 2006, MBIA sent the insurers copies of its settlement offer.  Any settlement was still unconsummated.

Then, on December 15, 2006, MBIA gave the regulators its final offer of settlement, which the regulators accepted in late January 2007.  The SEC issued a cease-and-desist order on January 29, 2007, and the NYAG finalized an assurance of discontinuance with MBIA on January 25, 2007.  These events marked a final settlement, and MBIA reported the investigations and settlements to the public shortly thereafter.  MBIA Inc., Current Report (Form 8-K) (Jan. 31, 2007).  In July 2007, the IC issued a report exonerating MBIA from wrongdoing with respect to

30

the Capital Asset and US Airways transactions.  This event officially ended the regulators' investigations.

The district court held that the addition of the IC in the course of settlement discussions breached the "right to associate" clause in the policies and that IC-related costs are therefore not covered.  MBIA, Inc., 2009 WL 6635307, at *8-9. Having considered the parties' nuanced and multifaceted arguments on appeal, we appreciate the difficult question the district court faced on this point.  Ultimately, however, we take a different view and conclude that the IC costs were covered.

We begin with the "right to associate" clause, which states in Federal's policy:

> [Federal] shall have the right and shall be given the opportunity to effectively associate with [MBIA] in the investigation, defense and settlement, including but not limited to the negotiation of a settlement, of any Claim that appears reasonably likely to be covered in whole or in part by this Policy.

J.A. at 126.  ACE's policy contains similar language: "[ACE] shall have the right, but not the duty, and shall be given the opportunity to effectively associate with the insureds in the investigation, settlement or defense of any Claim, even if [Federal's] Underlying Limit has not been exhausted."  Id. at 188.  As the policy language indicates, these policies required MBIA to give the insurers the opportunity to associate in settlement discussions.

MBIA argues that it notified the insurers of a proposed settlement and invited them to associate, in compliance with both

31

"right to associate" clauses, by its September 27, 2005, letter seeking consent to settle the regulators' investigations.[9]  See J.A. at 400, 1042, 1091, 1097.  MBIA also points to settlement discussions with the insurers throughout the settlement offer process as indications that it complied with the "right to associate" clause.  The insurers counter that although MBIA informed them of a proposed settlement of $75 million, it breached the "right to associate" clause when it failed to inform them until September 2006 of the addition of the IC to the settlement proposals.

The purpose of the "right to associate" clause is to provide the insurer with an "option to intervene" in the defense and settlement of a claim.  See Mut. Ins. Co. v. Murphy, 630 F. Supp. 2d 158, 166-67 (D. Mass. 2009); see also Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co., 979 F.2d 268, 277 (2d Cir. 1992) (describing right to associate as "opportunity"); Outboard Marine Corp. v. Liberty Mut. Ins. Co., 536 F.2d 730, 736 (7th Cir. 1976) (describing right to associate as an "option"). To "associate" means to "come together as partners . . . or allies."  Webster's Third New International Dictionary 132 (1986).  This right thus allows the insured and the insurer to come together as partners in investigating, defending, or settling a claim.  That partnership can be useful to an insured,

---

[9] We note that in an otherwise well-briefed appeal, no party put this quite relevant letter into the record.  We must rely on inferences from e-mail correspondence referencing and sending the letter and the insurers' responses to it.

32

who may lack the expertise and experience of an insurer, where, as here, the insured bears the duty to defend.  See Outboard Marine, 536 F.2d at 736.

Of course, providing the insurer with sufficient notice of the claim allows it to meaningfully exercise its option.  See Christiania, 979 F.2d at 277.  However, the right to associate is useful only if the insurer can use its experience throughout the process, not just at the end stages.  The policies read as such.  They provide, in the present tense, for an "opportunity to effectively associate with [the insured] in the investigation, defense and settlement" of a claim.  J.A. at 126.  Indeed, the Federal policy underscores this point by stating explicitly that the right to associate applies to "the negotiation of a settlement."  Id.

These principles lead us to conclude that MBIA fulfilled its obligations under the policies' "right to associate" clauses.  It provided sufficient notice of the claims involved in settlement discussions early enough in the process to allow the insurers to exercise their option to associate effectively.  Where the insured gives the insurer an invitation to associate with adequate information about the claim under consideration for settlement, the insured has done what is required under this clause.  This is not to say that the right to associate is a one-shot opportunity, but it is not the insured's duty to return to the nonparticipating insurer each time

33

negotiations about the same claim take a new twist and ask if the insurer still wants to opt out.  In short, the insured can take the insurer's RSVP at face value.

That is what MBIA did here.  It gave the insurers an opportunity to join with it in resolving the regulators' investigations, but the insurers declined to participate.  To give the insurers the opportunity to exercise their right effectively, as it must, MBIA notified the insurers of a potential claim long before settlement was discussed.  It informed the insurers of the nature of the claims and provided an estimate of the monetary amount of those claims.  It also met with Federal in person to discuss possible settlements.  After the insurers declined to participate in settlement negotiations, MBIA proceeded to negotiate settlements itself.

As it turned out, the settlements exceeded MBIA's $75 million estimate and included a different type of costs in the form of IC expenses, as opposed to merely disgorgement and penalties provided in the settlement offers.  But the IC review was not a standalone or separate claim about which MBIA had to invite the insurers to associate in defending or negotiating.  It was part of the settlement with the regulators, each of which conducted a single, comprehensive investigation into all of the transactions at issue, as explained supra in Part II.A.  The IC review component grew out of the natural course of settlement discussions about the same claim in which the insurers could have

34

participated all along.  The addition of the IC may have been a twist in settlement discussions, but it was not a new claim, nor was it an unforeseeable component of the settlement discussions. MBIA illustrates this reality by pointing out that ICs are not a rare component of regulatory settlements with securities regulators, so the insurers, which have extensive experience with other policyholder claims, should not have been "blindsided" when they found out that the settlements included such a component. See Schwartz v. Liberty Mut. Ins. Co., 539 F.3d 135, 146 (2d Cir. 2008).  And although the insurers argue that MBIA signed settlement agreements containing an IC review in October 2005, the fact remains that any offer of settlement made in October 2005 was preliminary; no settlement was consummated until the regulators approved it, which both the state and federal regulators did in January 2007, well after the insurers learned of the IC component.[10]  Finally, even at the time they were first notified of the IC in September 2006, the insurers made no

_____

[10] We acknowledge Federal's argument that because the initial settlement proposals were signed before the insurers were informed of the IC, the insurers were presented with a fait accompli when they were informed of the IC component as part of a final settlement.  Whatever the practical reality of this argument (an issue on which we take no view), MBIA nevertheless gave the insurers sufficient notice about the claims involved and the order of magnitude of any potential settlement, yet the insurers never attempted to join in settlement discussions. Thus, under the association clause, MBIA fulfilled its duties. That the information MBIA gave the insurers in October 2005 may not have been perfect in hindsight has no legal import because the insurers were given the opportunity to associate.  In any event, the insurers also had the opportunity to withhold consent from any settlement but failed to do so, as we explain below.

overtures to become involved in the settlement process.  They cannot now argue that they were denied their rights under the "right to associate" clause.

Because MBIA gave the insurers the opportunity to exercise meaningfully their option to participate in settlement discussions and adequately informed them of the nature and amount of claims under consideration for settlement, it did not breach its contractual obligation under the association clause.

Notwithstanding this conclusion, the insurers argue that a settlement including an IC review exceeded the bounds of the insurers' agreement not to raise consent to settlement as a defense to coverage.  The insurers argue that they agreed to waive this defense only for the $75 million settlement of the AHERF investigation, which they were informed about in October 2005.  MBIA disagrees, saying that the insurers gave it unconditional authority to settle.  It also argues that the insurers were seasonably informed of the IC component of the settlement offers so as to voice any objection before the settlements were completed.

The insurers' argument is rooted in the "right to consent" clause in the policies, which states that MBIA will not "agree not to settle any Claim, incur any Defense Costs or otherwise assume any contractual obligation or admit any liability with respect to any Claim without [the insurer's]

written consent, which shall not be unreasonably withheld."[11] J.A. at 126.

"A consent clause entitles an insurer 'to notice of a proposed settlement and an opportunity to determine, before the settlement, whether it will grant or withhold consent.'" Schwartz, 539 F.3d at 145 (quoting Travelers Indem. Co. v. Eitapence, 924 F.2d 48, 50 (2d Cir. 1991)). Whether notification is sufficient depends on the circumstances. See id. at 146-47; Eitapence, 924 F.2d at 50; State Farm Auto. Ins. Co. v. Blanco, 617 N.Y.S.2d 898, 899 (N.Y. App. Div. 1994). By an insurer's unreasonable delay, silence, or conduct, it can either waive a consent requirement or acquiesce in a settlement. E.g., Blanco, 617 N.Y.S.2d at 899; see also Jones Lang Wootton USA v. LeBoeuf, Lamb, Greene & MacRae, 674 N.Y.S.2d 280, 287-88 (N.Y. App. Div. 1998).

There is no doubt that MBIA informed the insurers about the $75 million proposed settlement with the regulators for the AHERF investigation; Federal and ACE each acknowledged that figure in responding to MBIA's request for permission to settle. J.A. at 1042-44, 1096-1100. In their letters, the insurers agreed not to raise their lack of written consent as a defense to

---

[11] In its brief, MBIA seems to suggest that ACE's policy does not include Federal's right to consent. ACE's policy incorporates the "terms, definitions, conditions, exclusions and limitations of the [Federal policy], except as otherwise provided [in the ACE policy]." J.A. at 187. The ACE policy is silent with respect to the right to consent, so we do not consider the policies as different in this regard.

coverage for those settlements — which the insurers carefully described as disgorgement and penalties related to the AHERF transaction. The waiver of a no-consent defense was not, as MBIA urges, unconditional. Thus, the question becomes whether, subsequent to the October 2005 settlement discussions, MBIA sufficiently notified the insurers of the addition of the IC to the settlement so as to allow them to withhold consent. We conclude that MBIA provided sufficient notification.

To begin, MBIA informed the insurers that any settlement proposal was subject to change. Although MBIA did not inform the insurers about the IC until September 2006, it did so then, in October 2006, and in a December 6, 2006, letter containing copies of its final proposed offer of settlement. The offer of settlement was sent to the regulators on December 15, 2006, and not accepted until the end of January 2007. These various notifications to the insurers were enough to allow them "determine, before the settlement, whether [they] will grant or withhold consent." Schwartz, 539 F.3d at 145. In Schwartz, we held that a jury could find that eleven hours of notice (overnight) was sufficient to satisfy a similar consent provision. See id. at 145-47. To be sure, Schwartz involved a situation where the insurer was deeply involved in settlement discussions and monitoring, so the eleven-hour time period in that case may have been enough because of the peculiar circumstances present there. See id. Thus, while we do not in

any way suggest that notification must meet a temporal bright line, we hold that in these particular circumstances, MBIA notified the insurers about the IC with more than sufficient time to digest the information under any conceivable standard. We explain briefly.

Even if we assume that the December 6 letter was the notification and the December 15 date was the time beyond which the settlement was no longer subject to change or objection, the insurers had over a week to decide whether to voice an objection or lack of consent. They had been informed of the nature of the claims to be settled and had solid indications of the dollar amount of those claims. Moreover, the insurers participated in at least two meetings with MBIA in September and October 2006 to discuss settlement proposals, including the possibility of an IC review. However, after no meeting or letter notice did the insurers do anything or voice any objection. Nor have they provided any explanation for their inaction. Given these facts, we conclude that MBIA provided sufficient notice of the IC component of the settlement. The insurers' agreement to waive lack of consent to settlement in 2005 was, by their silence and inaction, reasonably perceived by MBIA to be a continuing waiver of that defense as they learned more about the contours of the final settlement being considered, without expressing any objection to the additional provisions of the evolving settlement. See, e.g., Blanco, 617 N.Y.S.2d at 899 (acquiescence

39

in settlement or waiver of prior consent provision indicated by silence, insurer conduct, or unreasonable delay).  Although it may belabor the point, we note that the ultimate settlement arose from a single claim, see supra Part II.A., and included elements that grew out of a single course of settlement discussions, see supra Part II.C.  Given that the insurers were notified about the IC and did not object, MBIA was entitled in this case to presume that the insurers would not raise lack of written consent as a defense to coverage with respect to the IC costs.

Before we conclude, there is one loose end.  The insurers argue that the Assurance of Discontinuance ("AOD") entered into with state regulators precludes coverage of IC-related costs.  The district court did not consider this argument.  "Ordinarily, we will not review an issue the district court did not decide.  However, whether we do so or not is a matter within our discretion."  Colavito v. N.Y. Organ Donor Network, Inc., 486 F.3d 78, 80 (2d Cir. 2007) (Sack, J.) (internal quotation marks and citations omitted).  Mindful that "[w]e review a grant of summary judgment de novo applying the same standard as the district court," Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000), we exercise our discretion in this case to consider this argument in the first instance in order to minimize inefficiency and conserve judicial resources. This question is a pure matter of contract interpretation, and no facts are in dispute.  Contracts are construed to give the

40

intention of the parties effect, so an unambiguous contract "must be enforced according to the plain meaning of its terms." Cont'l Ins. Co., 603 F.3d at 180 (internal quotation marks omitted). If we find, as we do here, that the contract is unambiguous, we "may then award summary judgment." Int'l Multifoods Corp., 309 F.3d at 83 (internal quotation marks omitted).

The AOD says in the section outlining the $25 million in disgorgement and civil penalties: "MBIA agrees that it shall not . . . seek or accept, directly or indirectly, reimbursement or indemnification, including, but not limited to, payment made pursuant to any insurance policy, with regard to any or all of the amounts payable pursuant to this Assurance." J.A. at 338-39. The AOD then, in a separate section, goes on for six pages to discuss the requirements of the IC review, for which MBIA agreed to pay, with no limitation on MBIA's ability to seek or obtain reimbursement. That section states that the IC's "compensation and expenses shall be borne exclusively by MBIA, and shall not be deducted from any amount due under the provisions of this Assurance." Id. at 344.

The plain terms of the AOD fix the limitation on reimbursement to "amounts" due under the AOD. An "amount" is the "sum total to which anything mounts up or reaches" in "number" or "quantity." 1 Oxford English Dictionary 411 (2d ed. 1989). "Amounts" relate here to the "amounts" laid out in the contract: $10 million in disgorgement and $15 million in civil penalties,

not to unspecified "compensation and expenses" incurred by an IC. Moreover, IC-related expenses necessarily are not a set "amount" due because the IC, at the time the agreement was signed, was set to do work in the future.  Finally, the AOD itself distinguishes IC expenses from any "amount" due under the AOD when it says that IC expenses may not be deduced from the "any amount due."  It also contains two separate sections dealing with separate topics — first, a monetary payment amount for disgorgement and civil penalty and, second, an open-ended commitment to engage the IC to determine whether MBIA engaged in misconduct — but the reimbursement limitation appears only in the first section.

Given the terms of the AOD and its structure, we conclude that the AOD does not preclude MBIA's seeking reimbursement for IC-related costs.  Although it merely confirms our conclusion, it is instructive that the IC ultimately determined that MBIA did not engage in misconduct with respect to the Capital Asset and US Airways transactions.  If the IC had concluded otherwise, liability would have been outstanding under the AOD, and any agreement as to payment for such liability could have included a restriction on MBIA's ability to obtain reimbursement.

Absent a prohibition on obtaining reimbursement for these costs, MBIA may seek coverage for them.  Indeed, MBIA is entitled to coverage for costs related to the IC's review because the IC investigation was a covered investigation cost under the

42

policies.  The IC component was a thorough investigation of the claims relating to the Capital Asset and US Airways transactions and falls within the definition of "Investigation Costs" under the policies.

III. CONCLUSION

For the reasons elucidated above, we agree with the conclusions reached by the district court with respect to coverage for all costs except those related to the independent consultant.  The judgment of the district court therefore is affirmed in part and reversed in part.  We remand the case to the district court for entry of judgment in favor of MBIA on its claim for coverage of the independent consultant's costs.  The parties shall bear their own costs.